We're now ready for hearing in our second case, U.S. v. Foote, Mr. Fletcher? Fischer. Fischer. I'm sorry. I get it all the time. May it please the Court, I'm Clark Fischer representing Wesley Foote. Are you sure? I think so. But you know, they always misspell my name and leave a C out too, so whatever. Thank you. I will be dividing the argument this morning with Ms. DeLauro of the North Carolina Advocates for Justice, the amicus in this case. The career offender designation under 4B1.1 of the guidelines represents a reasoned decision by Congress and the Sentencing Commission that defendants who are the worst of the worst by virtue of their repeated criminal conduct should receive harsher punishment. Now while I stand on opposite sides of the podium from my friend Mr. Rand, that's a provision of a law we all agree on. But what we also in this case agree on is that Wesley Foote is categorically not a career offender. Under Simmons, his 1995 North Carolina drug conviction, for which he received a sentence of 10 to 12 months under the structured sentencing law, is undisputedly not a qualifying felony. The record's also clear that in this case, unlike so many other 2255 defendants, that at every step of the way, he challenged his career offender designation. He filed objections to the original pre-sentence report that were overruled under HAARP. He appealed to this court, which in 2007, following the then applicable president of HAARP, rejected his career offender arguments. He then filed a 2255, making the same argument, and after Simmons, he amended his 2255, and here we are today. So it turns out he was right. He was not a career offender. But despite that, up to this point, he's still serving a 22-year sentence that's many years beyond what the guidelines call for, and the issue before you today very squarely is whether or not Wesley Foote, on these undisputed facts, has any claim to relief under 2255. Now one of the first things they teach in law school, I certainly remember it, is an old common law principle, doubtless goes back to England, that for every wrong, there's a remedy. But if you accept the government's argument in this case, Wesley Foote has no remedy, regardless of the justice of his claim or the merits of his position, it doesn't matter. It's just too bad that he's serving, depending on how you do the math, somewhere between 74 and 111 months, and the guidelines really call for it. What you have to fit into is the miscarriage of justice, and that's a, pursuant to the What is your response to that? Well, you're certainly correct that if you look at the Davis case and the Doncio and Hill, those Supreme Court cases addressing that issue, they use the language, has to be a fundamental defect, use that specific phrase, that amounts to a, quote, complete miscarriage of justice. And there's certainly a lot of authority that talks about, well, that certainly applies if you have a sentence beyond a statutory maximum, which we don't have here, at least a theoretical maximum. And we don't have actual innocence. He really did commit the 1995 offense. But I would suggest to the Court, as I was preparing for this argument, the inquiry's a little bit strange. Well, what's the fundamental defect? Could you start with that? I certainly can, Your Honor. The, and I think to answer that question, you have to consider just how important the guidelines are to federal sentencing, even in this post-Booker world. The Supreme Court in the Pew case in 2013, I believe, referred to the guidelines as the lodestone of federal sentencing, the starting point from which all sentencing calculations stem. They referenced that 80% of all cases in the federal system are within the guidelines. Are you saying a misapplication of the guidelines is a fundamental defect? I think there is a difference. If that's the case, everybody gets a habeas do-over, don't they? And that's not what I'm suggesting, Your Honor, because unquestionably, Congress intended there be some significant limitations on 2255. And if you look at the language in the, to answer your question, in the present case, I think McAloona's makes reference to the language that something along the lines of absent extraordinary circumstances, guidelines error doesn't qualify, except in unusual cases. And I think a situation, for instance, where there was a miscalculation of the criminal record. Let's suppose there's a difference in criminal history category five and criminal history category six. Well, that does make a difference in the guideline range, but there's overlap in the grid that we use between those two ranges. So why is it the determinative question for purposes of the defect, whether or not the underlying sentence is lawful, whether or not it's within the statutory maximum? If it's within the, if what has happened stays within the statutory maximum, how does it become a fundamental defect? Well, Judge, I think in contrast to the example I gave a minute ago about a record calculation, here we've got a starting point that the court had to consider and the court followed, admittedly at the low end. And it's a starting point that resulted in not just a few months difference. I'm just sort of ignoring, and I can understand that because it's hard to get around. The fundamental guidance, the fundamental cabining structure for us is the statute. So how does a sentence within the statutory range constitute a fundamental defect? And I completely take your point about the disparate impact of the career offender status. My question really just very specifically is, if it keeps you under the statutory cap, how can it be a fundamental defect? Judge Shunkin, I would refer you back to the Simmons case itself, which I think there's been some discussion earlier today about how it's a strange North Carolina case based upon North Carolina structured sentencing. But clearly, what Simmons said is we look at the truth of a case. In that case, the truth of whether a person has a record. In this case, the truth, I would argue to you, is that had Wesley Foote not been wrongly labeled the worst of the worst as a career offender, while certainly maybe theoretically he could have still gotten 262 months. If you look at all the statistics and the reality, certainly in the Middle District, the chances are huge that he would have gotten somewhere within that 151 to 188 that the judge called for. And I don't believe, Judge Shunkin, that is something that we can ignore. And when we talk about years of a man's life, not just a few months here because of a record calculation, but years, I would submit that satisfies a reasoned application of what a fundamental defect is. Because he's actually innocent of being a career offender. I think you – I think I have certainly in my brief used that phrase. And obviously, we get into legal technicalities. Well, innocence really goes to the offense. But in terms of that status, and it's a determinative status, for him, he's not. We all agree he's not and he shouldn't have been. And he – and something – when we go to the fundamental nature of the defect, when you have a defendant like Wesley Foote, who has been arguing this from day one, who came to this court and made the same argument and was told he was wrong, but it turns out he was right. It seems to me that we're talking about an unusual situation that does amount to a fundamental defect. And that is kind of the bottom line of our position here, that this is years of this man's life. It's something he has pressed from day one, unlike Whiteside, unlike so many of the other defendants that you see that are trying to argue for equitable tolling or some other grounds. And words like, you know, extraordinary, unusual, you know, sort of, you know, you can't really pinpoint what that is. Can you – could you craft a bright-line rule for your position that we could adopt because otherwise there's just no real finality? Well, kind of going back to something I had meant to say earlier about making it strange, we talk about a complete miscarriage of justice. I don't know how you have a partial miscarriage of justice. But either you do or you don't. But I would suggest, and I've thought about this a lot, and I know the court has to think about it. It seems to me you could craft a rule just on the facts of this case. No, no. Or rather, perhaps that's her question, but my question would be, what's your rule? What is the bright line that you give us? That a properly preserved career offender argument that results in substantially increased time is something that should be one of those extraordinary situations where a defendant can come to the district court under 2255 seeking relief. That would be the – It's a miscarriage of justice you're arguing, but have you skipped over the fundamental defect from your answer? Well, again, in terms of fundamental defect, I think the fact is under the guidelines when the judge started him off at a status that he didn't have, I would call that fundamental, Your Honor. That would be our position. Any court agreed with that definition of fundamental defect? Well, at this point, we have decisions that are kind of all over the place. Certainly more decisions, I think, have gone against this. The Spencer case from the Eleventh Circuit is the most recent. That was a 5-4 with three judges not participating that, you know, who knows where this one goes from here. You have the Narvaez case, which did support our position cited in the brief. Of course, then there's another decision from the same circuit, the Hawkins case, that went the other way. But, you know, I know I'm a little past my time here, but what I would just – Which is the more applicable because the guidelines are advisory here. And the one that went the other way was guidelines that were advisory. That's what it said, Your Honor. And I'm telling the Court when you look at that principle and then consider where the Supreme Court in 2013 talks about how important the guidelines are. And certainly that's my experience in the Middle District where usually what all the defense counsel, myself included, are arguing is for a low-end guideline sentence. Back to that truth in the situation that Simmons dealt with, it seems to me that is something we have to consider. And I would just conclude this portion by calling the Court's opinion to what I think was telling language from Judge Martin dissenting in that en banc decision in Spencer. I believe the federal courts as an institution would be stronger if we simply acknowledge that Mr. Spencer's sentence was wrong from the start and fix it. Is that really so hard to do when you've got a defendant who's been fighting it every step of the way? Thank you, Mr. Fisher. Thank you very much. We have some time for rebuttal. Ms. DeLauro? Good morning, and may it please the Court. Jackie DeLauro for North Carolina Advocates for Justice. I'd like to start, as Judge Duncan suggested, with the statute itself. I think that's gotten lost a little bit here. There are several issues that are cognizable on collateral review on a 2255 proceeding. They are when the sentence was imposed in violation of the Constitution or laws of the United States, or the court was without jurisdiction to impose the sentence, or it was in excess of the maximum authorized by law, or the category that applies here, which is that it is otherwise subject to collateral attack. The Narvaez case, although it was pre-Booker, was a case in which he was not sentenced above the statutory maximum. So that's a case that can give the court guidance here. And as Judge Rovner explained in her dissent in Hawkins, the distinction made on the basis of whether Booker is advisory or mandatory is illusory, because it doesn't change the fact of the fundamental defect, Judge Keenan, which is that this career offender designation so taints everything else that happens at sentencing. And that's something that no longer applies to Mr. Foote. As a result of this designation, his sentence is completely disconnected from the circumstances of the offense and the characteristics of the offender. And that's in direct contravention of what Congress explained sentencing is supposed to be about in 3553A. So when someone has the application of the career offender designation, it means that their offense levels are going to be tied to the statutory maximum. It means that their criminal history category is automatically a 6. It means that the judge cannot apply mitigating reductions under Chapter 3 for the individual's role in the offense. So as a result, someone who's responsible for 51 grams of crack and is a lackey in an organization is subject to the same sentence as someone who is responsible for 500 keys and is a ringleader. So that's a vastly disparate set of circumstances that could result in the same sentence with the application of the career offender guideline. If we were to agree with you, is there the potential that the same sentence of 262 months could be imposed on remand? No, Your Honor. It's not possible? Is that what you're saying? No, for several reasons. You're saying no, it is not possible for several reasons. Yes, that's right. First, because the career offender designation could not be reapplied because the two predicate felonies no longer exist. Second, because a sentence of 262 months would be substantively unreasonable. And that's so because the Supreme Court instructed under Gall that if there's going to be a variance from the guidelines, the district judge has to explain that variance and has to take account of the extent of the variance. Well, on the re-sentencing on the Kimbrough re-sentencing where the district court did again sentence them to 262 months, the court went through the 3553A factors and explained why that sentence was appropriate again. That's right, Your Honor. But that was before some retroactive guidelines amendments occurred, and Judge Tilley at that re-sentencing in fact mentioned that he would be potentially interested in re-sentencing Mr. Foote if those retroactive guidelines amendments came to pass. He said, once Congress does make some change, and this is regarding the crack powder discrepancy described in Kimbrough, I'll be glad to consider your case when it comes back as a result of that. As I mentioned, I would be glad to consider if the change is made how that does affect your sentence at that point and adjust the sentence accordingly. And that's something that because of the application of the career offender designation, Judge Tilley never had the opportunity to do. He was categorically ineligible for these guidelines amendments under this Court's decision in Munn because he was a career offender. I'd just also like to mention briefly that allowing career offender designations to be reviewable on collateral review wouldn't open the floodgates, and that's so because this Court recently reaffirmed in Whiteside that it's going to vigorously apply AEDPA's statute of limitations. Equitable tolling will not automatically apply as a result of Simmons. You have very few individuals who would be affected by this decision. And as Mr. Fisher mentioned, Foote raised this issue at every relevant point. It's not procedurally defaulted. He doesn't have any issue in his plea agreement as to whether he's entitled to raise this on collateral review. So the Court has no further questions. I'll rest on the brief. Thank you very much. Mr. Rand. Good morning, and may it please the Court. Ripley Rand for the government. The misapplication of the career offender advisory guideline in this case is not the product of a fundamental defect and did not result in a complete miscarriage of justice because the sentence was below the statutory maximum in this case. When a defendant is sentenced below the statutory maximum and is claiming error on collateral review and has not proven actual innocence of a predicate crime or that a prior sentence was vacated or that otherwise the proceeding below was either irregular and invalid, the defendant cannot satisfy the demanding standard that the error equals a fundamental defect, constituting a complete miscarriage of justice. And so the challenge is not cognizable. Why wasn't the sentencing invalid from the outset when you start with a career offender designation that was not correct? Well, at the time that the sentence was imposed, it was correct under HAARP. With respect to the fundamental defect, what I believe Mr. Fisher was representing to the Court is that a movement on the grid equals a fundamental defect. No, I think what he's saying is, or at least as I understand it, was really the point that Judge Thacker asked in her question, why isn't he actually innocent of being a career offender? So why isn't this more analogous to Davis, even though that went to the conviction? But why isn't he actually innocent of being a career offender? In Davis, the conduct under— I understand that. It's different in Davis. It is different. But why isn't this of equal magnitude, arguably, in terms of— ordinarily we don't think sentencing is, but if this man was not a career offender and he's called a career offender and the calculation starts much, much higher because of that, why isn't that a fundamental defect? I would submit to the Court that the placement on the grid, moving on the grid is not a fundamental defect in this case because under Davis, the conduct being illegal, what the courts have said is that when a predicate conviction is vacated based on the conduct not being illegal— The acts are no longer criminal. The acts are no longer criminal or there have been other cases where, in the Cuevas case from the First Circuit recently, there was no finding that the acts weren't criminal but that there was something that infected the proceedings such that the convictions needed to be vacated. In this case, we're talking about a legal classification, how the conviction is viewed by the courts, which is different from the convictions being vacated. And both the Spencer Court and the Cuevas Court said that that distinction matters. It's a mere legal classification as opposed to the vacation of a conviction altogether. With that, if the career offender designation falls out, would Judge Tilley be able to re-sentence Mr. Foote to the 262 months on remand? Judge Tilley would have the authority and the jurisdiction and the discretion to impose the same sentence after considering the 3553 factors. I want to make sure I understand what you're saying. Are you saying that it is legally possible for him to do so? Yes. Would he have to—go ahead. No, you may be getting to that. Would he have to depart upward to do so? He would have to depart upward, yes. Significantly? Significantly. I think I understand what you're saying. I'm sorry, go ahead. He would have to upwardly depart and explain it, but it is within his legal— he would have the authority to do so with—subject to the justification. Correct. Okay, so Mr. Wren, there's really no upper limit in terms of effect in your analysis. And by that I mean if it's another 10 years a person gets or another 20 years, another 30 years, it doesn't really matter because it's not a defect. I mean, isn't that what you're saying? Well, the— It's really irrelevant. The statutory cap would be the top. Yeah, as long as—let's say if it were potential for a life sentence and the miscalculation added on 30 years, you're saying that really wouldn't matter in the analysis. Isn't that correct? I think that that's one of the problems with the test that's been proffered to this court and to other courts about how to view this is where do you draw the line? How do you draw the line? Right. How would you write the opinion if you were writing the opinion of the court? Where do you draw the line? I would write it in favor of the government if I were writing the opinion. Well, obviously. I think we were looking for a little more guidance than that. Would you adhere to the analysis that caps it at the statutory maximum even if the statutory maximum were life? Yes. So it wouldn't matter if the person got an extra 30, 40, or 50 years as long as he or she could have gotten life? That's a hard decision to make, but I don't know of any other way, and I don't think any other of the circuits or the lawyers that have been before the circuits in the other cases have come up with a way to draw that line to make it effective to where it's not arbitrary one way or the other. I don't know how to draw that line, and I haven't heard anything today about where you would draw that line. I think what your opposing counsel are asking is that you draw the line at career offender status because that is a unique designation. Career offender status is basically just a place on the grid. It's got a specific name, but it's not a completely different sentencing structure. It doesn't have a different table. It's just a place on the grid. It's a place on the grid with a label. You label the defendant as a career offender. That's more than just a place on the grid as a starting off point. Well, it does have a name, but it does mean different things to different defendants. To Mr. Foote, it meant a five-level increase and no change in his criminal history category. He was already criminal history category six before you put the career offender in. What it means for Mr. Foote is a five-level increase above where he would have been. What it means to other defendants obviously would be different things, but that's part of what makes it hard to draw the line and figure out where to draw the line because Mr. Foote can say, well, my five levels matters to me. Therefore, it ought to be cognizable. Then you can have a defendant come in later and say, well, under 2D1.1, my six-level increase for involvement of a minor matters, even though I was criminal history category six to begin with. Since Mr. Foote's was five, mine was six. That means mine ought to be cognizable. It's, again, where do you draw the line? How do you draw the line? The second example, was that a career offender or just an enhancement? I take your point, though, because there's a considerable potential for variation in enhancements based on vulnerability of the victim magnitude. This just happens to be one with the label. It has a name with a capital letter at the beginning as opposed to just a location on the grid. If this court decides that only career offender challenges pursuant to Simmons or whatever with respect to the predicate convictions are cognizable, it's going to open the floodgates regardless because of, like the example I just gave, defendants who say, well, my criminal history category was a five and it got bumped to six, or my enhancement was four levels, and so that's kind of the same as Mr. Foote. These challenges are going to be brought even if this court limits it to career offender. These challenges are going to be brought saying my case is like that even though it may not have a name. The movement on the grid is the same or it's at least similar, and so I'll get to bring my case because it has the same sort of effect as Mr. Foote's case. The court could simply say, no, it doesn't have the same effect, right? I mean, just because people ask the court for relief doesn't mean we'd be obligated to grant the relief. Agreed. And I guess what I'm more concerned about is reviewing your floodgates argument in terms of would there be a mass of people who arguably would be entitled to relief as opposed to a mass of people who would be claiming entitlement to relief but without substantial support for their argument. Obviously, there would be a much bigger group who would claim it than would be entitled to it if this court limited it. Right, to career offenders. To career offenders. There would be a much bigger group. Right, but what I'm saying is would there be a much larger group who would have a strong claim? You see what I'm saying? Anybody can come into court and say my case is like this, and that shouldn't dissuade us from doing something that's legally correct. Just because we're going to have the tractor-trailers come up to our door, fine. That's what we do for a living is hear the cases. It seems to me that what you have to do is to say that this violates the concept of habeas corpus because there will be huge numbers of people coming into the system who will have colorable and valid or arguably valid claims for relief, and you won't be able to distinguish them from career offenders. You see what I'm saying? I agree with that. I agree that that's how it would work out. Could you explain why that is so from your perspective? With respect to the career offender designation, like I said, it's a place on the grid. It has a name. But the movement on the grid, defendants will come in and say my movement on the grid is the same. Just because it has a name doesn't mean it's necessarily going to result in any additional punishment different from the movement on the grid. You're saying there's analytically no distinction between being a career offender and not being a career offender in terms of seeking habeas relief. With respect to movement on the grid, no, I don't believe there is any analytical difference. And I get your point. I think, too, it would depend on how the opinion were crafted. So it's not totally within anyone's control until the court established as clearly as it is possible to do what the parameters are of the exception that it's making. That's correct. And there would invariably, I suspect, be challenges to what those parameters are and the extent to which they're sustainable. That's correct. And I believe that's what the courts in Spencer and in SunBear and in Hawkins and Arveaz and Cuevas have struggled with is how to deal with this to set it up to where you include the group of people who you want to include and outclude the group of people you don't want to include. That's been something that obviously there's been a lot of dissent, a lot of discussion. And to this point, I don't think anybody has come up with a test that distinguishes who gets relief versus who doesn't get relief in that sort of scenario. With respect to the miscarriage of justice component of this, this court has previously said that it's extraordinary circumstances that mandate relief in a 2255 context and involve a complete miscarriage of justice. And the government would contend that this is not an extraordinary circumstance. This is, again, a movement on a grid that's a sentencing error that this court and all the other courts have said previously sentencing errors are not cognizable as long as the sentence is lawful. And there's no dispute in this case that the sentence is lawful within the statutory maximum. And so the government would contend that with respect to the facts in this case, the defendant's argument, the defendant has not carried his burden. Mr. Foote has not carried his burden to show that he has shown a complete miscarriage of justice. With respect to the test that Mr. Foote and the Advocates for Justice set forth, there appear to be three things that they contend are miscarriages of justice. The magnitude, the too much time argument that you've heard a little bit about this morning, the branding of the career offender, just the use of the name, and the retroactive sentence reductions that Ms. DeLauro spoke about. With respect to the magnitude, I believe I've already talked about that, that where do you draw the line is three years too much, it's 20 years, 30 years. There's nowhere really to draw the line or a way to draw the line in which it's not arbitrary between certain classes of defendants, certain levels of sentence. Also, the too much time argument, the government would contend, is speculative. You can't really say how much time is too much time or that the defendant would have gotten nine fewer years or 11 fewer years because you don't know how much time the defendant gets in excess until the resentencing. So it puts the cart before the horse a little bit in that regard. With respect to the branding part of it, I believe I've covered that, that just using the name career offender, there's no additional punishment separate from the movement on the grid that comes along with that. It's not a different set of guidelines, a brand new set or anything. It's just movement on the grid that mandates the change in that regard. With respect to the retroactive amendments, we don't know in this case whether Mr. Foote was eligible for those or not. There's nothing in the record about his treatment history in prison or anything of that nature. To include things like a defendant's treatment history in prison in an analysis of whether a claim is cognizable on collateral review, I would contend would make things very difficult, if not impossible, for a district court to put together that, to have many trials about how those things affect a 3553 analysis or a 3582 analysis would be unmanageable for the district court, as well for this court trying to review those kinds of decisions. We create a bunch of unnecessary litigation. Also, it's speculative in that, in looking at the retroactive amendments, what a court would inevitably have to decide is whether a defendant might have gotten a different sentence under the guidelines, whether a defendant might have been eligible for retroactive amendments, and whether a judge might have exercised his or her discretion in order to give a sentence cut for those. Mr. Rand, if we agree with your position today, are we then precluded from reaching a different result under mandatory guidelines, as long as the statutory maximum is not exceeded? In a Norvegia sort of situation, I believe that the Seventh Circuit has decided that the mandatory guidelines would . . . I'm asking you for your position, though. I'm just wondering that relief denied to this defendant would necessarily be relief denied to a defendant in a mandatory guidelines context, and I'm interested in your position on that, the consequences of us agreeing with you today. The government's position in the Norvegia's case was that it didn't matter whether it was mandatory or advisory. I understand that the courts have made a distinction about that, and I think that there is an importance in that distinction, but with respect to this case, we would argue that Mr. Foote would not be entitled to a claim and not have cognizability as to this claim. A couple of other things that I wanted to add. The finality issue, I think, has been adequately discussed in the other cases. I don't think finality is the only reason that this case is not cognizable. I don't think that you just necessarily hang finality on any decision without looking at the other matters, but I think it's more important that any kind of test that would be put to a district court to implement in deciding whether these claims are cognizable or not is going to be unworkable. There's not going to be any sort of bright-line test about where you draw the line or how you draw the line, and to put that to a district court and then to ask this court to review it is going to make things too unwieldy because there always will be somebody on the other side of the line. Unless there are any further questions for the court, we would ask the court to affirm the decision of the district court. Thank you. Thank you very much. Mr. Fisher? Thank you. Just to address a few of the things argued by the government, I would contend that calling career offender designation just a movement on the grid issue is simply wrong, and I would... If I may, if I think I know where you're going, and if you disagree, just feel free to tell me so. A career offender designation has a profound impact on a defendant's sentence. I take that to be your point, and I take that as given. I think that's clearly reflected here. Yes, ma'am. There will be other enhancements that have an equally profound effect on a defendant's sentence, and my concern, stepping back, is if we draw the line at that particular characterization, how do we defend that characterization in response to the defendant who comes in with an equally, with an enhancement that has an equally profound impact on his or her sentence? So what is the... And it goes to line drawing, but it also goes to, I think, constitutional defensibility from a due process standpoint. I totally agree. So what is your response to that concern that I have articulated unquestionably, extremely inartfully? I would never tell this Court that anything you say is inartful. No, I said that. Okay, well, then I completely agree. But to try to answer the question, Your Honor, each case is different. Each case has to rely on its own facts. Obviously, we have to have legal standards that we as lawyers try to argue and you as judges apply. As to Wesley Foote and Wesley Foote alone, that's my sole client. He's my one client here. You have a unique set of facts. You start out, you've got the additional time, we all agree with. We've got the situation where Judge Tilley has indicated on the record that were there guideline amendments that could give him less time, he would love to have considered them. But then you also have in what I think really has to factor into any rule here, you've got a defendant who properly, clearly, repeatedly preserved the issue from day one. We have all sorts of procedural default cases, white side being won, white side loses, no matter how good his case may be. When you've got somebody who came to this court in 2007, raised the same issue, and this court told him, no, you're wrong, you've got to do the time. And now, after Simmons, the reality is he was right. That, and perhaps I'm being inartful now, but I think you can construct a combination of the substance, the guidelines error, and the preservation of a claim that would limit the applicability of this decision in this case going forward. I would disagree that there's really any significant floodgates argument here. It's a weird North Carolina sentencing rule. I mean, I'm used to doing it. It doesn't seem weird to me, but I understand from the outside it is. You've got a limited number of people, either record level one, two, or sometimes three in Class H felonies. You've got a situation where very few of those are there. Very much fewer preserve the claim. So there really aren't many people, I would contend, that are going to be affected by this, but certainly Wesley Flood is. And you know what? Even if there were, even if there was 1,000 North Carolina defendants that were going to be affected, if we got it wrong, then we ought to get it right. You know, that's exactly what Congress did in the sentencing commission when they amended the guidelines to correct the crack powder disparity. We worked through it. There's no discernible distinction between direct review and collateral review. It's just another way station in route to what we deem to be the best result. Well, I think it's important on that point to keep in mind that this case, Wesley Flood's case, is really an action of timing, and I think it does show a difference in direct and collateral review. When he's sentenced in 2007, harps the law, he loses. If he was sentenced after 2007, we wouldn't be here today. Had his appeal been heard after Simmons instead of before, he would have won. And I think that is crucially significant in this case. And I thank the Court for its consideration. It is always a pleasure for Mr. Fletcher to appear before you. For you. Either way. Thank you very much. Thank you very much for your representation today. We will come down and greet counsel and then adjourn. And we will stay and speak briefly with the law students who are observing the argument from William and Mary. This honorable court stands adjourned until tomorrow morning at 8.30. God save the United States and this honorable court. And one other thing, Mr. Fisher, I do note that you are court appointed, and we would like to thank you for your very able service to this court.  Thank you.
judges: Allyson K. Duncan, Barbara Milano Keenan, Stephanie D. Thacker